**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-278-1 (BAH)** |
| **v.** | : | |
| | : | |
| **ROBERT SCHORNAK,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Robert Schornak to four to six months' imprisonment, one year of supervised release, 60 hours of community service, $500 in restitution, and the mandatory $25 special assessment.

**I.      Introduction**

The defendant Robert Schornak, a 39-year old business developer from Michigan, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Schornak pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds, a Class A misdemeanor. As explained herein, a sentence of incarceration is appropriate because (1) he expected to meet violence at the Capitol before he even left Michigan; (2) consistent with that expectation, he went in wearing a vest and helmet and carrying a bullhorn; (3) he went in at a violent point in time after admittedly

witnessing violence take place between law enforcement officers and rioters; (4) in fact, he was exposed to chemical irritant; (5) he stole a flag and paraded around the Capitol with it; (6) he has never expressed remorse or cooperated with authorities; (7) to the contrary, he consistently bragged about his conduct, indicating that he continues to take pride in it.

The Court must also consider that Schornak's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the Congressional certification vote of the 2020 Presidential election.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 47 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.

### Robert Schornak's Role in the January 6, 2021 Attack on the Capitol

Schornak knew that President Trump planned a "Stop the Steal" rally in Washington, D.C. on January 6, 2021. About a week beforehand, on December 29, 2020, he sent a message to his brother stating the following: "We're obviously going next week, we can't stay home n watch our republic be stolen. They want a fight let's have it." Schornak subsequently exchanged messages on Facebook with co-defendant Daniel Herendeen in which they discussed their dedication to attend the "Stop the Steal" rally. Schornak said he would "not be able to live" with himself if he stayed home, and he told Herendeen that "nothing easy [was] ever worth doing."  In

Facebook messages with another individual, Schornak asked to borrow a bullet proof vest. He stated, "I'm going to DC on the 6th and I don't expect it to be peaceful."

On January 5, 2021, Schornak traveled from his home in Michigan to Washington, D.C. with co-defendant Daniel Herendeen. Subsequently, Schornok posted a Facebook message that read, "Just got here, tomorrow u will see a show!"

On January 6, 2021, as depicted in Image 1, Schornak (circled in blue) posed for a photograph wearing a military-style tactical vest and carrying a helmet and bullhorn in Washington, D.C.

Image 1



At approximately 2:03 p.m., armor-clad law enforcement officers engaged with members of a mob, some of whom were assaulting officers, on the West Front of the U.S. Capitol

Building. The United States Capitol Police had also set up amplification equipment that repeatedly broadcast an order commanding the crowd to disperse. In conjunction with that amplified recording, law enforcement deployed crowd control munitions, that is, flash bangs, against the mob.

Image 2, captured at approximately 2:23 p.m., depicts what the West Plaza looked like on January 6, 2021.



Government's Exhibit 1 is shown below as Image 3 and shows Schornak entered the Capitol through the Senate Wing doors no later than 2:26 p.m.  To get to that entry point, he observed the chaotic and violent events taking place at the West Front of the Capitol around that time.

Image 3



Although the Senate Wing doorway was unguarded at the time Schornak entered, shortly afterward and while he still stood near the entrance holding what appears to be a canned beverage (as depicted in Image 4), law enforcement officers attempted to limit additional entry by rioters. Schornak ignored the obvious fact that the officers did not want anyone in the Capitol and walked farther into the building.

Image 4



At approximately 2:29 p.m., law enforcement officers attempted to lower a gate leading from the Crypt to the Capitol Visitor's Center and were met with resistance by rioters as shown in Government Exhibit 3 and Images 5 and 6. Robert Gieswein (appearing in the box) was one of the rioters who pepper-sprayed officers. Schornak appeared seconds after the rioters successfully prevented the officers from blocking the rioters' pathway to the Visitor's Center (Image 7). Schornak and others covered their faces and appear to be coughing due to exposure to the irritant that lingered in the air.

Images 5 and 6





Image 7



By approximately 2:30 p.m., Schornak had traveled to the Crypt Lobby East area and walked among the columns, as depicted in Government Exhibit 2 and Image 8.

Image 8



A few minutes later, at approximately 2:32 p.m., Schornak appeared on video in Emancipation Hall (Image 9).

Image 9



At approximately 2:33 p.m., Schornak posed for a selfie with Robert Gieswein in Emancipation Hall, as depicted in Government Exhibit 4 and Images 10 and 11.

Image 10



Image 11



As depicted in Images 12 and 13, Schornak traveled to the Visitor's Center and stole an American flag between 2:35:01 p.m. and 2:35:08 p.m.

Images 12 and 13



At approximately 2:36 p.m., as depicted in Government's Exhibit 5 and Images 14 and 15, Schornak was captured on video in the Crypt Lobby East area parading through the Capitol carrying the stolen American flag. Schornak admitted that he stole the flag from the Capitol.

Images 14 and 15





As shown in Image 16, Schornak exited the Capitol with the stolen flag at approximately 2:38 p.m.

Image 16



After exiting the Capitol Building, Schornak handed the American flag to two men standing on a platform, as shown in Images 17-19. The flag was not recovered from Schornak.

Images 17-19







After leaving the Capitol on January 6, 2021, Schornak sent numerous messages regarding his conduct. At 5:53 p.m., Schornak sent messages to his brother in which he stated, "We stormed that bitch!! Shit was crazy as fuck!!" He added: "I stole the senate flag n took it outside to be waved it atop the scaffolding before I collapsed, tear gas is not joke man." He sent a message to another individual stating, "We stormed the Capital!! [sic] Wait until you see it!! . . . Yeah, when government fears the people there's liberty, when the people fear the government there's tyranny, they were scared today, and I'm damn proud of it. The Capital [sic] has never been breached before, we did it." In another Facebook message Schornak stated: "Never been

tear gassed before, very unpleasant, so is getting pepper sprayed n beaten w batons, but honestly I didn't even feel those until much after. I'm sure I will tomorrow, but today we shook the halls of Congress n tried to remind them who they work for n who they shouldn't fuck w"

Schornak also sent a video to his brother that he took while inside the Capitol and recorded himself saying, "This is what a revolution looks like."

On January 7, 2021, Schornak posted the following comment on Facebook: "I will never apologize for what we did, ever."

On January 22, 2021, Schornak sent the following private message on Facebook to C.H.: "Hey Cindi, Please erase that post about me at the Capital [sic], I really don't want that info out there for Obvious reasons, please. This one please" He included a post that he sent to C.H. at 7:23 p.m. on January 6, 2021, that read: "yes I was in it, front line tear gased, pepper sprayed n batoned."

*The Charges and Plea Agreement*

On April 2, 2021, a federal grand jury returned a five-count indictment charging Schornak and Herendeen with Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four); and Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five).

On November 12, 2021, Schornak pled guilty to Count Two of the Indictment, which charged him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18

U.S.C. § 1752(a)(1). Pursuant to the terms of the guilty plea agreement, Schornak acknowledged

that the charge of 18 U.S.C. §1752(a)(1) carries a maximum sentence of one year imprisonment,

a one-year term of supervised release, a fine of no more than $100,000, and a mandatory special

assessment of $25. Schornak also agreed to pay restitution in the amount of $500 to the

Department of the Treasury.[1]

## III.    Statutory Penalties

The defendant now faces sentencing for Entering and Remaining in a Restricted Building

or Grounds, in violation of 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S.

Probation Office, the defendant faces up to one year of imprisonment, a fine of up to $100,000,

and a term of supervised release of not more than one year. The defendant must also pay

restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v.*

*Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  By plea agreement, the parties have agreed

that the riot caused approximately $1.5 million of damage to the United States Capitol, and the

defendant agreed to pay restitution in the amount of $500. That restitution should be paid to the

Clerk of the Court, who shall forward the payments to the Architect of the Capitol as indicated in

the Presentence Investigation Report ("PSR"). PSR at ¶ 103.

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the offense to which the defendant pled guilty is a Class A misdemeanor, the

Sentencing Guidelines are applicable. In cases where the Guidelines are applicable, the

sentencing court "should begin all sentencing proceedings by correctly calculating the applicable

---

[1] The Court may also sentence Schornak to up to five years of probation if he is not
sentenced to a term of imprisonment. *See* 18 U.S.C. § 3561(a) & (c), United States Sentencing
Guidelines ("USSG") §§ 5B1.1, 5B1.2. Conditions of probation may include a period of home
detention and community service. USSG § 5B1.3(e).

Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Schornak's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 38-47.

The PSR incorrectly suggests that the applicable specific offense characteristic under U.S.S.G. §2B2.3(b)(1)(A)(i) is applicable because the trespass occurred "at a secure government facility." PSR ¶ 40. However, as indicated in Schornak's plea agreement, the trespass occurred "in restricted area." Accordingly, the applicable specific offense characteristic is U.S.S.G. §2B2.3(b)(1)(A)(vii), which refers to a trespass occurring "at any restricted building or grounds. On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). Because a two-level increase applies under either theory, there is no difference to the final offense level.

The U.S. Probation Office calculated Schornak's criminal history as category I, which is not disputed. PSR at ¶ 52. Accordingly, the U.S. Probation Office calculated Schornak's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment

range at 0-6 months. PSR at ¶ 85. Schornak's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

The Court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49-50. Under § 3553(a), "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).

Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of incarceration.

21

A.      The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history and defies comparison to other mass criminal events. It represented a grave threat to our democratic norms. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, this Court should assess Schornak's individual conduct in the light of the spectrum of the rioters' conduct on January 6. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the

defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants. The defendant's lack of violence and property destruction explains why he was charged only with, and permitted to plead to, a misdemeanor rather than a felony.

Here, Schornak's criminal conduct included several aggravating features which raise significant concern. Prior to January 6, 2021, Schornak demonstrated preparation and intent by engaging in communications about his anticipated combative behavior in Washington, D.C., stating "*we can't stay home n watch our republic be stolen. They want a fight let's have it.*" He also sent messages to another individual and requested to borrow a bullet proof vest because he was "*going to DC on the 6th and I don't expect to be peaceful.*" He then came to Washington, D.C. with tactical gear and a bullhorn to participate in a riot. As he approached the Capitol Building, in an obvious scene of struggle between the mob and law enforcement on the west front of the Capitol, Schornak took a route to the Capitol Building through that scene. He did not enter the Capitol through the Visitor's Center or any other entrance intended for a lawful entrance. Nor could he have, as the building was closed to visitors due to the ongoing pandemic and on lockdown due to the breach of the security fence. Instead, he entered the Capitol Building in a very key location and only 13 minutes after the first breach of the Capitol. When he entered through the Senate Wing doors, the doors and adjacent windows were visibly broken and glass was on the floor. After his entrance, Schornak stood back and watched as others poured through

the Senate Wing doors and windows. While he stood at this breach location, with an audible alarm sounding, Schornak casually looked around while gripping a beverage in an aluminum can.  While inside the Capitol Building during the riot, he used his cell phone to record video of the unlawful activity all around him. Also while inside the Capitol Building, Schornak traveled to the Crypt area and then to Emancipation Hall.  While there, he posed for a selfie with Robert Gieswein, the second rioter to enter the Capitol Building, who was dressed in full combat fatigues, to include a helmet and a flak vest, and carrying a baseball bat and an OC spray canister that he was enthusiastically deploying against law enforcement, immediately after Gieswein sprayed law enforcement officers with the OC spray in close proximity to Schornak.  *See Government Exhibit 3 and Images 5-7 and 10 and 11, supra*. Schornak then stole an American flag and paraded with it while in the Crypt and during his journey. He remained inside the Capitol for approximately 12 minutes.

After departing the Capitol Building with the stolen flag, Schornak handed the flag to men on a scaffold to apparently celebrate his actions and those of others and encourage other rioters. Additionally, Schornak boasted to his brother and to another individual on Facebook that he intended to take the flag and "*wave[] it atop the scaffolding before I collapsed, tear gas is no joke man*." He also boasted that he had stormed the Capitol Building and celebrated his actions and those of his fellow rioters when he stated, "*This is what a revolution looks like*" and "*I'm damn proud of it*."

Schornak didn't personally assault anyone or break anything, but he was near others when they were violent and by his presence and enthusiasm (wearing military gear and waving a flag) he provided support and encouragement. He hugged Gieswein after Gieswein who, like Schornak, was dressed in combat gear, including a helmet and a flak vest, after Gieswein

24

enthusiastically deployed OC spray against law enforcement. Furthermore, by Schornak taking

the flag the way he did, parading through the Capitol with it, handing it to the men on the

scaffolding outside the Capitol during the riot, and not returning it to where it belonged is clearly

an uncharged theft and close to destruction of property. Schornak clearly knew that he did not

have permission to enter the Capitol or take the flag, but did so anyway.

On and after January 6, Schornak celebrated his criminal conduct on social media. But,

on January 22, 2021, he asked Cindi to remove posts that he sent her about his January 6

conduct.

Although Schornak has accepted responsibility by pleading guilty, he has not expressed

remorse or cooperated with investigators. And, prior to being arrested, Schornak stated that he

would "never apologize for what we did, ever."

Accordingly, the nature and the circumstances of this offense establish the clear need for

the recommended sentence of incarceration in this matter.

## B.     The History and Characteristics of the Defendant

As set forth in the PSR, Schornak is a 39-year-old man who was born in Detroit,

Michigan. PSR at ¶ 57. He has lived in Michigan his entire life. Schornak graduated from Wayne

State University in Michigan in 2005 with a bachelor's degree in psychology, PSR ¶ 71.

According to admissions at Schornak's plea hearing, he also studied pre-law and should have

known that his conduct was unlawful.

His employment history reveals that from 2006 to 2018, he was employed as an account

manager for Debt Solutions Network, in Chesterfield, Michigan, and from 2018 to 2021, he was

employed in sales at Cunningham Glass Company, Inc., in Livonia, Michigan. PSR ¶¶ 76-77.

According to the PSR, Schornak did not provide the required documentation relating to his assets, liabilities, and monthly cash in-flows and out-flows, which forced the Probation Office to conduct independent research through commercial government tracking sources to complete a financial analysis. PSR ¶¶ 78-79.

Despite the fact that Schornak has a criminal history score of 0, the instant offense represents his fifth arrest, although he does not appear to have interacted with the criminal justice system since 2006.  As a result of his three prior convictions, all traffic and/or misdemeanor offenses, Schornak has either paid a fine or served a period of probation.

Taken together, Schornak's history and characteristics reveal an individual who should have outgrown the alcohol-fueled crimes of his late teens and early twenties as he has gained in educational and professional experience and begun to establish a family.

## C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

on our democracy and that jail time is usually – should be expected") (statement of Judge Hogan).

### D.     The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. Many who participated in the riot intended to delay or even prevent one of the most important democratic processes we have: the peaceful transfer of Presidential power.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* At 70; *see United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24-25 ("What

happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government. . . . [and those who committed] violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188 (RDM), Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Schornak's actions – before, during and after the riot – demonstrate the need for specific deterrence. As stated above, prior to January 6, Schornak anticipated that there would be mayhem at the U.S. Capitol and he intended to be a participant. He did indeed join in the chaos and made a video recording of the "storming" of the Capitol. He even stole a United States flag while he walked through the building.  Afterward, he boasted about the riot. He demonstrated no recognition of wrongdoing until he pled guilty and accepted responsibility.

**E.      The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with

Congress.[3] Each offender must be sentenced based on their individual circumstances, but with the entirety of the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[4] "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 (statement of Judge Lamberth).

In previous sentencings of January 6 defendants, the government and the sentencing courts have made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. While those who trespassed, but engaged in

---

[3] Attached to this Sentencing Memorandum is an Exhibit containing tables providing additional information about the sentences imposed on other Capitol breach defendants. The tables also show that the requested sentence here would not result in unwarranted sentencing disparities.

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Avoiding unwarranted disparities requires the Court to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike the defendant in *Hemphill*, pleaded guilty and cooperated with the government). Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

No previously sentenced case contains the specific mix of aggravating and mitigating factors present here. The aggravating factors are (1) demonstrating a prior intent to interfere with the Congressional proceedings; (2) preparing for violence by bringing a military-style tactical vest and helmet; (3) capturing video of unlawful conduct and sharing it with others, including social media; (4) hugging and taking a selfie with a man with a man carrying a baseball bat and

wielding OC spray; (5) stealing a flag); (6) using the stolen flag to encourage other rioters; (7) boasting about unlawful conduct using electronic communications; and (8) asking others to delete their social media posts mentioning his presence in the Capitol. Moreover, Schornak has admitted that he was near and saw violent conduct before he entered the Capitol and that he was spayed by chemical irritant. This indicates that he was near violent conduct where the police needed to use crowd-control measures. Finally, Schornak celebrated his conduct after he left the Capitol and never expressing remorse.

The Court may consider prior sentences imposed on January 6 defendants who, like Schornak, pleaded guilty to violating 18 U.S.C. 1752(a)(1).In none of these cases did the defendant engage in as many or as significant aggravating factors as Schornak.

In *U.S. v. Courtright*, 1:21-cr-72 (CRC), Courtright briefly entered the Senate floor area, temporarily seized U.S. government property, attempted to break into locked doors, and made inflammatory social media posts. Courtright was sentenced to one month of incarceration, 12 months of supervised release, 60 hours of community service, $500 restitution.

In *U.S. v. Ridge,* 21-cr-406 (JEB), Ridge used electronic communications to express his intention to block Congressional proceedings, recorded video of unlawful activity inside the Capitol Building, and boasted on social media after leaving the Capitol that he had stormed the Capitol and others had broken down doors. Ridge was sentenced to 14 days consecutive incarceration, $1000 fine, 1 year supervised release, 100 hours community service, $500 restitution.

In *U.S. v. Tryon,* 21-cr-420 (RBW), Tryon resisted law enforcement's attempt to prevent him from entering the Capitol Building, undeterred by the police and being pepper-sprayed and hit with a baton - entered the Capitol anyway after witnessing a rioter

break a window and open a door, boasted to a YouTuber that he had been pepper-sprayed and beaten with a baton and expressed his desire to enter the Capitol to disrupt Congress. Tryon was sentenced to 50 days incarceration, one year supervised release, $500 restitution, $1,000 fine, $500 restitution.

Even though the theft of the flag was uncharged, it is relevant conduct and should still be given great weight in determining the sentence in this case. The theft of such a large item, parading with it around the Capital, and removing it from the Capitol is unusual.[5] Moreover, Schornak did not steal the flag as a souvenir. Instead, he took it to use it to rally other rioters and handed it to the men on the scaffolding outside the Capitol for this reason. Therefore, it is appropriate for this Court to consider this aggravating factor and also consider the 30-day prison sentences imposed by the Court in *United States v. Vukich,* 21-cr-539 (TSC), and *United States v. Perretta,* 21-539 (TSC), in which the defendants stole Congressional paperwork and subsequently discarded it.

There are also several other misdemeanor cases in which rioters either directly witnessed or knew of violence occurring and engaged in some, but not all, of the aggravating situations that appear in this case and received sentences of incarceration. *See e.g. United States v. Jancart*, 21-cr-148 (JEB) (brought a gas mask and two-way radio, videotaped unlawful conduct and posted it to social media, boasted on social media, destroyed evidence by deleting videos) (45 days); *United States v. Rau*, 21-cr-467 (JEB) (prepared for violence by bringing Kevlar gloves, videotaped unlawful conduct,

---

[5] The theft of the flag, with an estimated value of less than $1,000, could have been charged as a misdemeanor pursuant to 18 U.S.C. § 641. For such offense, the statutory maximum sentence is one year imprisonment and the applicable sentencing guidelines are 0 to 6 months' imprisonment.

destroyed evidence by deleting videos) (45 days); *United States v. Reeder*, 21-cr-166
(TFH) (entered the Capitol building twice, recorded unlawful conduct, boasted about his
participation afterwards) (3 months).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is
"only one of several factors that must be weighted and balanced," and the degree of weight is
"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d
220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with
the result that "different district courts may have distinct sentencing philosophies and may
emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision
involves its own set of facts and circumstances regarding the offense and the offender." *United
States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and
will sentence differently—differently from the Sentencing Guidelines range, differently from the
sentence an appellate court might have imposed, and differently from how other district courts
might have sentenced that defendant." *Id.* at 1095.

In all, after a review of the sentencings in these analogous cases and the applicable
Section 3553(a) factors, the government believes that Schornak should be sentenced to four to
six months' imprisonment for his role in the Capitol riot and that this sentence would not present
an unwarranted sentencing disparity.

F.      Restitution

As noted above, Schornak agreed under the terms of the plea agreement to pay $500 in
restitution.  At plea hearings, this Court has ordered the government to explain how it reached the
restitution amount reflected in the plea agreement, which notes that, as of May 17, 2021, the riot
at the United States Capitol had caused "approximately $1,495,326.55" in damages.

33

Determining the restitution amount is an "inexact science," *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009), that must be based on a "reasonable approximation of losses supported by a sound methodology," *United States v. Gushlack*, 728 F.2d 184, 196 (2d. Cir. 2013). The nearly $1.5 million figure quoted in the defendant's plea agreement is the loss estimate provided by the Architect of the Capitol as of mid-May 2021.   The government continues to investigate losses that resulted from the breach of the Capitol on January 6, 2021, a process that involves several facets.  As a factual matter, the government is continuing to collect evidence concerning (1) the cost of damages to the Capitol Building and Grounds; (2) the costs associated with the deployment of additional law enforcement units to the Capitol on January 6; (3) the cost of broken or damaged law-enforcement equipment; (4) the cost of stolen property; and (5) costs associated with bodily injuries sustained by law enforcement officers and other victims.

As a legal matter, some of these costs (such as property damage and medical injuries) clearly fall within the scope of the restitution statutes as applied to some defendants (*e.g.* defendants who broke a window or committed aggravated assault against a law enforcement officer).  But other costs, including employees' work time, see *United States v. Wilfong*, 551 F.3d 1182, 1184 (10th Cir. 2008), and the proper method for assessing value of damaged or destroyed property, see *United Stated v. Shugart*, 176 F.3d 1373, 1375 (11th Cir. 1999), raise more challenging questions that should be resolved as they arise.  To the extent a victim's losses in a particular case are "not ascertainable" at the time of sentencing, Section 3664 permits an extension of up to 90 days for a "final determination" of those losses.  18 U.S.C. § 3664(d)(5); *see Dolan v. United States*, 560 U.S. 605, 611 (2010) (allowing a sentencing court to order restitution after the 90-day deadline under some circumstances.  Here, the question of cost of the flag not recovered from Schornak remains an issue.

**VI.     Conclusion**

For all of the reasons set forth above, the government recommends a sentence of four to six months' imprisonment, one year of supervised release, 60 hours of community service, $500 restitution, and the mandatory $25 special assessment. Such a sentence would protect the community, promote respect for the law, and deter future crime, and be "sufficient but not greater than necessary" to accomplish the goals of 18 U.S.C. § 3553(a)(3).

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY
DC BAR NO. 481052

By:      *Anita Eve*

ANITA EVE
PA Bar No. 45519
Assistant United States Attorney (Detailee)
U.S. Attorney's Office
555 4th Street, N.W., Room 5840
Washington, D.C.  20530
Anita.eve@usdoj.gov
(215) 764-2177

Exhibit and Attachment List

Videos:

1.     Exhibit 1 – video of Schornak's entry to the Capitol
2.     Exhibit 2 – video of Schornak walking in the Crypt
3.     Exhibit 3 – video of Schornak adjacent to the gate from the Crypt to the Visitor's Center
4.     Exhibit 4 – video of Schornak with Gieswein in Emancipation Hall
5.     Exhibit 5 – video of Schornak carrying stolen American flag in the Capitol

*Note that the 5 videos have been provided via electronic communication to the Court.*

*Note that the government does not object to the public release of any of the above videos.*

Attachments:

1.     Table 1 -Table of sentencing decisions