**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No.   21-cr-278 (BAH)** |
| **ROBERT SCHORNAK** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Robert Schornak, through his attorney, Eugene Ohm, hereby submits the following memorandum in aid of sentencing in this matter.  Mr. Schornak respectfully requests that this Honorable Court follow the recommendation of U.S. Probation and sentence him to a period of lengthy probation and community service.

Mr. Schornak is a thirty-nine year old man with a minor criminal history from his teenaged years.  He is a devoted husband and father to a sixteen month old boy.  At the time of his arrest, he was working as a salesperson for Cunningham Glass and Door.  Because of the arrest, he was terminated and despite his serious efforts to get hired again, he remained without a full time job for the next eight months.  He worked for a landscaping company for several months to try and support his family.  He was hired in November 2021 by England Logistics.  In the last three months, he has thrived at work and become a valuable employee but as the sole breadwinner in the young family, the significant pay cut and the debt incurred during the past year have presented additional challenges.

On November 12, 2021, Mr. Schornak pleaded guilty to Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. §1752(a)(1).  Based on all of the factors discussed below, Mr. Schornak respectfully requests that the Court impose a sentence of two years of probation and that he complete 100 hours of community service.

## BACKGROUND

At approximately 2:29 pm on January 6, 2020, Robert Schornak made what he now describes as the biggest mistake of his life.  For twelve minutes, he walked through the Capitol building at a time when others were destroying property and attacking police officers.  While he came to the District to attend a rally and walked to the Capitol with the intention of protesting, he made a grave mistake by walking onto Capitol grounds and into the building.  This was a crime and Mr. Schornak is deeply remorseful for his actions.

Mr. Schornak's spontaneous decision to enter Capitol grounds was criminal but also separate and apart from his decision to come to the District to loudly protest and separate from his concern that there would be violence at the rally.  He, like many others, mistakenly anticipated perceived a threat to Trump-supporters from Antifa.  From evidence in his devices, it is clear that he was reasonable in his belief – he received several warnings about Antifa plans to attack protestors and had read articles that Antifa had attacked protestors in the November rally in Washington.  And while that information was decidedly false, that was the sole reason that Mr. Schornak wore protective, albeit aggressive looking gear, to the rally.  The proof of his intent is in his actions - Mr. Schornak did not bring any

2

weapons to the rally and did not participate in any of the violence and rage that was developing around him.

Mr. Schornak has since begun working to repent for those twelve minutes. He has worked to seek forgiveness from his family – he recognizes that he jeopardized the future of his wife and infant.  He has worked to seek forgiveness from his country – he has done all that he can to help the House of Representatives Select Committee in their mission to prevent this from happening again.  And he now seeks forgiveness from this Court, having taken responsibility not only for his own actions but also acknowledging the greater harm that his presence in the Capitol brought upon this country.

Robert Schornak thought the election was stolen.  While he is accepting responsibility full responsibility for his actions, he trusted the voices of his party that repeatedly assured him that there was undeniable proof that Donald Trump won and Joe Biden lost.  As anecdotes circulated around his news outlets of dead people voting and missing ballots, he paid close attention and concluded that Donald Trump had won the presidential election.  And when then-President Trump called upon his followers to come to Washington D.C., there was no doubt to Mr. Schornak.  As he said, to the House Select Committee – "My mindset was, at that point, the President had asked me for two things.  My vote and to be at the rally.  At that time, I had to go."

When then-President Trump called his supporters to protest on January 6th, he prepared to go, despite his wife, Agnieszka's concerns.  Agnieszka asked him to

stay - she is a stay at home mother that cares for their son Max, three months old at the time. She feared for his safety – they had read that there were violent clashes between supporters of then-President Trump and counterprotesters. Mr. Schornak has acknowledged that he was further motivated to come to the District because he had learned that Antifa was planning to harass and perhaps attack the supporters – just as had happened in the November rally in D.C. He did not bring weapons – he has never owned a gun - but he told his wife that he would borrow a flak jacket from his cousin so he wouldn't get hurt if Antifa started trouble.[1]

Mr. Schornak arrived early on January 6th to secure a good spot to view then-President Trump. But many others had arrived early too so he settled near one of

---

[1] The Government suggests that Mr. Schornak came to the District to start violence but that is not true. The evidence upon which they rely, postings on Facebook, is taken out of context. Other evidence from Mr. Schornak's phone, showed that he attended a protest in Lansing on November 14, 2020 in protest of the election – he then stated, "we the people are not going to stand by and watch the left steal this election and our Country, we will FIGHT." He protested in Lansing in a non-violent manner. In referencing the efforts to collect evidence of voter fraud, he stated: "[T]here's over 100 people in MI alone who've signed affidavits who witnessed voter fraud. Now the fight begins!" He later stated, in reference to allegations of voter fraud, "We will fight and we will win! God bless Trump, all of those fighting for him!" He urged others to engage in "civil disobedience" within the context of the "fight." After Rudy Giuliani and Jenna Ellis went to Arizona to speak to GOP state lawmakers, Mr. Schornak posted, "It isn't over folks, not by a long shot! Bringing in some heavy hitters for the fight!!" After viewing speeches on purported election fraud, he commented "Those speeches this week were AMAZING!! Keep Fighting for our country!!" He also posted "Please keep fighting for us and we'll keep fighting for you and this country." On November 25, 2020, he posted, "THANK YOU FOR THE HARD WORK!!! KEEP FIGHTING FOR US!!" In the many times he used the word, Mr. Schornak consistently equated "fighting" with resisting and pursuing election fraud – not physical violence.

the large television screens.  He listened to every word of the speeches – he had been to several Trump rallies – and he wanted to hear about the case that the Trump team had built in support of what he believed to be was election fraud.

Mr. Schornak heard the then-President tell him to go to the U.S. Capitol, but he also heard him say "peacefully and patriotically."   Mr. Schornak was among the tens of thousands who walked to the Capitol because Mr. Trump told him he would meet them there.  He and Mr. Daniel Herendeen parted ways with others he had met there, including Cliff Altobelli who was present at the rally but did not go to the Capitol.  He recalls that Mr. Schornak plan was to protest, and said they would "be so loud the walls are going to shake."  Exh 1.  But Mr. Schornak arrived at chaos and was among those who unlawfully entered a restricted building.

He walked through the building and left in twelve minutes.  In that time, he did nothing remarkable other than to take a selfie with a passerby who was similarly dressed and to drink from a soda (which he properly discarded).

Despite his limited conduct, Mr. Schornak also acknowledges that the presence of those like him may have encouraged the others who were destroying property and attacking officers.  He now knows that there were insurrectionists who had plans beyond what he could have imagined.  And he recognizes that taking the flag was both criminal and profoundly disrespectful.  He understands that his actions were destructive to our Democracy and an embarrassment to the country on a global scale.  He also recognizes that there was no conclusive evidence of election fraud and that President Biden is our legitimate president.

Since the inception of this case, Mr. Schornak has committed himself to making amends for his actions. For Mr. Schornak, he decided to do everything he could.  He participated in a debriefing with the FBI and spoke of everything that he knew and answered every question.  In early January, he was invited to speak to the Select Committee of the House of Representatives.  He was told that this aspect of the Select Committee was investigating how this event could have occurred and how a future event could have been prevented.  He was warned that there would be no benefit promised with meeting with the Committee and, in fact, he could be further prosecuted if they learned of new information.  He participated enthusiastically and reported every aspect of everything that he knew.

This meeting was successful and the Select Committee Investigators asked him to return for a transcribed deposition, so that his account and the information he provided could be made part of their record.  Mr. Schornak again cooperated, this time with more senior members of the Investigative Team.  He answered questions again for nearly two hours and invited the Committee to followup, if necessary.

In doing so, Mr. Schornak was advised that there was even a possibility that he might be asked to publicly testify.  Mr. Schornak, without hesitation, agreed.  He wishes to make a clean break from his past, from the thinking that led him to his actions on January 6th and was eager to demonstrate that desire.  In addition, if his participation with the Select Committee would encourage others to come forward (Mr. Schornak participated despite being advised that he was the ***only*** client of the

D.C. Federal Defender Office to do so), he would gladly do so.  He recognizes the need for him to do whatever he can to heal the wounds inflicted on that day.

## ARGUMENT

### I.   Legal Standard

The Court is well aware that the Supreme Court's opinions in *Kimbrough v. United States*, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), have dramatically altered the law of federal sentencing.  Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. §3553(a).  Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment.  *See* 18 U.S.C. §3553(a).

### II.   Imposing a Sentence of Two Years of Probation is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).

The Defense concurs with U.S. Probation Office's recommendation of a period of probation.

Mr. Schornak committed a trespassing offense. The Government says he should be incarcerated and focuses on a misimpression that he lacks remorse. But as he and his family attests, Mr. Schornak has long been remorseful of his actions. And once he was arrested and considered a jail sentence that would take him from his family, once he lost his job, with a newborn baby in a still-new marriage, his remorse became more profound. He will never do this again. He thus ignores the media, the calls defending the Capitol defendants, the belabored and false justifications for his conduct. His remorse is sincere and without reservation.

The Government has aggressively prosecuted felony offenses related to January 6th. In general, all defendants charged with assault have been required to plead to assault and defendants who acted to disturb the certification were required to plead to obstruction. It remains unclear what distinguishes between the Government's offers between petty misdemeanors or Class A misdemeanors. But factually, Mr. Schornak is only guilty of trespassing. He should thus be sentenced as a misdemeanant, with no criminal history score who has fully accepted responsibility and is sincerely remorseful. He should also be sentenced as an individual who has cooperated with the Government, because he cooperated with Select Committee investigators .

### a. Mr. Schornak's Personal History and Characteristics

Robert Schornak grew up in a working class family in Michigan. His parents were divorced when he was a teenager and he lived first with his mother and then his father. He married his wife Agnieszka and she brought Maxmillian Schornak

into this world about fifteen months ago.  By all accounts, Mr. Schornak is a great and doting father and a caring husband.  He is known to be a generous and caring neighbor and friend.  He is a devoted Christian and he has turned to his church leaders to reflect on his wrongs.  He is a hard worker who willingly shoulders his responsibilities – from helping around the house to working in landscaping, despite allergies to grass, to make ends meet after he was fired from his job because of this arrest.

Mr. Schornak is the rare person who does good deeds when no one is looking and never seeks credit.  He has had a strong impact on the lives of those around him and is well-known to be the person to depend upon when no one else is willing or able.  As his neighbor attests, "His compassion and care for other humans is remarkable."  Exh. 3 (Letter from Diana Ingram). He learns from his mistakes and his supportive family is a constant reminder of where his renewed focus lies.

Mr. Schornak has had an interest in politics for some time and described himself as a conservative.  During the social media age, he received most of his news through Facebook (he is unconnected to television) and the media accounts that were posted by those whom he friended or followed.  Although his experience with Facebook contributed to the unilateral viewpoint that he recently developed, it has made it much easier for him to stand by his commitment to remove politics from his life entirely.  He reports that when he is not working, he spends time with his baby and his wife.  He is completely disengaged from political news now.  He recognizes that on January 6th, he jeopardized himself and his family.  He is

committed to focusing on them and making amends for the harm that he has caused.

Mr. Schornak's acceptance of responsibility includes his cooperation with government investigators for three two-hour meetings.  The Government does not contest Probation's conclusion that Mr. Schornak has accepted responsibility.

### b.  Nature and Circumstances of the Offense

Although Mr. Schornak has taken responsibility for illegally entering the Capitol building, there are a number of reasons why this factor weighs in favor of a sentence short of incarceration.  Mr. Schornak had no plans to go to the Capitol. And he did not engage in any violence or destruction that day.

On the days leading up to January 6th, Mr. Schornak paid close attention to "news" reports that then-President Trump had won the election.  As he told the FBI, his older brother Chris had a leading role in the local Michigan Republican party and told him that there were irregularities in voting in Michigan.  Mr. Schornak thus believed that election fraud would conclusively be proven.

Mr. Schornak came to the District only to go to the rally in support of then-President Trump.  He had no interest in disrupting the certification vote.  He had no intention to go to the Capitol until he was told to go to the Capitol by the then-President and saw everyone else walking towards the Capitol. So while Mr. Schornak planned to come to the District, there were no plans to go to the Capitol until he actually did. If the then-President had told him to go to White House, the Lincoln Memorial or the courthouse, that is where he would have gone.

It is undisputed that in the twelve minutes that he was inside the Capitol building and in the time he was in Washington D.C., Mr. Schornak did not engage in any assaultive, physical or destructive acts.  Though he had a megaphone, he did not use it inside.  He was cooperative and polite with all of the police he encountered.  He did not enter any sensitive areas.

Mr. Schornak did however post messages about entering the Capitol.  He deeply regrets those messages and has had no social media activity since January 2021.[2]

The government argues that there are several "aggravating features" as it relates to Mr. Schornak.  ECF 62 at 23-24.  Mr. Schornak accepts responsibility for the misdemeanor unlawful entry but, to be clear, that is all that he did.  Qualitatively, his conduct is no different than many of the Petty Misdemeanor offenses.  There is no evidence or suggestion that he assaulted anyone, went into sensitive areas, confronted police or destroyed any property because he did none of those things.

---

[2] In a message cited by the Government, Mr. Schornak, inflated his experience by claiming that he was 'front line tear gassed, pepper sprayed n baton."  This was also taken out of context.  Immediately after this quote cited by the Government, Mr. Schornak said: "I was trying to help the police because I could see what was happening but got pushed through.  We didn't attack the police, they attacked us and we moved them out of the way.  They were helping me out n thanking me when I left."  As video evidence demonstrates, none of this was true.  Mr. Schornak was not on the front line, not tear gassed, pepper sprayed or attacked by police.  Though he was obviously in the general area of clashes between the police and rioters, the video shows he was never in close proximity to any violence.

First, the Government contends that Mr. Schornak's use of the words "fight" combined with his flakjacket and helmet demonstrate that he came to the District to "participate in a riot." Second, that Mr. Schornak took a selfie with a passerby who was carrying a baseball bat and a spray after Giesman sprayed officers. And third, the Government argues that Mr. Schornak has not expressed remorse or cooperated with investigators.

The third of these assertions is factually wrong. As the attached letters attest, Mr. Schornak has long since expressed remorse to his loved ones throughout the life of this case. With counsel, Mr. Schornak cooperated with investigators on three occasions and expressed his remorse when he did. On September 28, 2021, he was interviewed at the FBI building in Detroit, Michigan while his counsel and the U.S. Attorney participated by video. On January 4, 2022, he participated in an interview with the House of Representatives' Select Committee and answered dozens of questions from several investigators. Because of his candor and his insightful answers to questions regarding January 6th, Mr. Schornak was asked to participate in a "staff-led deposition" with senior staff members.[3] In short, Mr.

---

[3] Unlike the debriefing with the FBI, no promises were made to Mr. Schornak prior to the debrief. He was not provided use immunity. He was told that the Committee was separate and apart from the Department of Justice and would not advocate for a lenient sentence. However, he was told he would be referred for criminal prosecution if the Select Committee determined that he had lied or had confessed to criminal conduct that was previously unknown to the Department of Justice. He was also informed that the Department of Justice was under no obligation to adjust its allocution because of his cooperation.

Schornak cooperated in every way that was available to him.  The House Select Committee asked to transcribe his statements because they appeared to be valuable to the Committee's mission.  And to address the Government's point, in all of those conversations, Mr. Schornak expressed deep remorse.

It is apparently true that Mr. Schornak took a photo with someone who recently had assaulted officers – but that comes as news to Mr. Schornak.  He recalls a person passing by dressed similarly and a seconds-long interaction and selfie.  But Mr. Schornak has no association with Mr. Giesman. *See e.g.* ECF 62 at 6.  The Government implies that Mr. Schornak is somehow responsible that earlier, Mr. Giesman sprayed a police officer and Mr. Schornak arrives in that general area.  But Mr. Schornak passed through that space fifty one seconds and dozens of people later.  There is no indication that Mr. Schornak had any idea what Mr. Giesman did and the timing in Government's Exhibit 3 demonstrates that he wouldn't have.  Exhibit 3 also shows that Mr. Schornak was standing around and walking alone.  He did not and does not know Mr. Giesman and he did not know what Mr. Giemsan did until counsel informed him about the Government's Memorandum.

The Government also relies heavily upon the assumption that Mr. Schornak came to the District "to participate in a riot."  ECF 62 at 23.  Since Election Day, Mr. Schornak became convinced that the election was illegitimate.  He followed the

---

Counsel informed the Government of Mr. Schornak's cooperation on February 8, 2022 because the Government's recommendation was apparently made absent that knowledge.

recounts and the lawsuits and referred to all of those actions as fighting or part of a fight.

Mr. Schornak did wear a flakjacket and helmet to Washington D.C. and acknowledges that it was meant to intimidate. But Mr. Schorank had read, repeatedly, that Antifa was going to attack Trump supporters at the rally. Mr. Schornak conveyed this to his family before he left. This was, from his perspective, a reasonable belief. Saved in his phone was an article that claimed to show "apparent Antifa or Black Lives Matter agitators brutally attacking purported supporters of President Donald Trump."

https://www.theepochtimes.com/mkt_app/at-least-20-arrested-as-protesters-clash-in-washington_3579565.html. And other Trump-supporting friends warned him of rumors pervasive on the internet that left-wing activists intended to confront them with violence.

The contention that Mr. Schornak came for violence is also contradicted by his actions that day. Mr. Schornak did not bring any weapons or sprays. And because he unsurprisingly did not see Antifa attack anyone, he never came close to engaging in any violent or destructive conduct. When he saw rioters destroy property inside the building, he yelled at them to stop. His interactions with officers was civilized and not aggressive. When he was told to leave, he left immediately. While there is no reason to objectively believe that Antifa played any role on January 6th (or that they even exist in any organized capacity), it is clear that Mr. Schornak believed that Antifa existed, was organized, and intended to be

present on January 6th.  And in his debriefings, he relayed that he understood that older Trump supporters and women would be present and as an able bodied man, he thought he should be prepared to defend them.[4]

The Government also relies upon Mr. Schornak's repeated use of the word "fight."  But Mr. Schornak described the political battle over potential election fraud as a "fight" numerous times between Election Day and January 6th.  His phone revealed statements that he made where he repeatedly thanked political figures and attorneys for their role in the "fight."  *See* p.3 n2, *supra*. He watched speeches and sent messages urging them to "keep fighting." It is clear, in context, that the word "fight" did not mean a physical fight, a riot or an insurrection.  That is corroborated by the fact that Mr. Schornak did not fight, did not scream or incite, did not challenge anyone and was in no way part of any violence.

Lastly, the Government argues that Mr. Schornak's sentence should be enhanced because he "ask[ed] others to delete their social media posts mentioning his presence in the Capitol" apparently referencing a single request made to a friend on January 13th.  At that point, Mr. Schornak had heard of individuals being at the Capitol losing jobs and becoming social outcasts.  This concern was legitimate – Mr. Schornak lost his job of three years when his arrest became public.

### c.  The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate

---

[4] This position may not be reasonable to someone who is exposed to different types of news outlets that at least attempt to be objective.  And for most of those in the District, this concern would be met with something between rolled eyes and laughter.  But for those like Mr. Schornak, this information was presented to them as absolute fact.

### Deterrence, and the Need to Avoid Unwanted Sentencing Disparities

Based on Mr. Schornak's personal history and characteristics, it is clear that his conduct on January 6, 2021 was an isolated event that was completely out his character.  It is also extremely unlikely that he will recidivate given his minor criminal history and his perfect record on pre-trial supervision for the past year. Any potential for recidivism can be addressed by the probationary sentence recommended by the Defense and substantial community service.

United States Probation has recommended a sentence of probation and the Defense joins in that recommendation.  The government recommends a severe sentence of 4 to 6 months' incarceration followed by a period of probation.  A 4 month sentence would more than double the highest sentence imposed in a §1752 case.  A 6 month sentence would more than triple that sentence.[5]

When weighed against other cases, Mr. Schornak's conduct is more suitable for a sentence that spares him of incarceration.   The government's recommendation

---

[5] According to the Government's Exhibit, to date there have been eight sentences imposed for violations of 18 U.S.C. § 1752(a)(1).  Rachel Pert was sentenced to 24 months probation.  Jeffrey Witcher was sentenced to a $5000 fine.  Kevin Cordon was sentenced to 12 months probation.  Dana Winn was sentenced to 10 days of incarceration on weekends.  Felipe Marquez was sentenced to 3 months home detention.  Gracyn Courtright was sentenced to 1 month incarceration.  Leonard Ridge was sentenced to 14 days incarceration.  William Tryon was sentenced to 50 days incarceration. The median sentence for these cases is between 3 months home detention and 10 days of weekend incarceration.  The mean sentence is 13 days of incarceration.

has no support when analyzing past sentences and its imposition would result in a

drastic disparity in sentencing.

Recently, Judge Hogan imposed a sentence of 3 months home detention in a

case that bore some similarity to this case in that the Defendant there stole an

American flag. *United States v. Wiedrich,* 21-cr-581 (TFH).[6] But unlike Defendant

Wiedrich, Mr. Schornak did not bring the flag home, did not lie to the FBI, and did

not lead the way in pushing through doors guarded by police. Moreover, Mr.

Schornak provided three interviews with investigators in order to assist them in

any manner possible.

The cases in which individuals have been incarcerated present far worse

conduct than that of Mr. Schornak. In *United States v. Bradley Rukstales*, 1:21-CR-

041 (CJN), the court imposed 30 days of incarceration after the government alleged

he threw a chair in the direction of police officers who had been forced to retreat and

was ultimately brought to the floor by an officer having to be dragged out of the

Capitol building after resisting their efforts. Mr. Schornak's conduct is inexcusable

---

[6] There, the Government argued for a 45 day sentence because: "1) Wiedrich
screamed and cheered while the forward line of the rioters broke through the police
line; 2) he was one of the first in a crowd that pushed its way inside the Senate
Wing doors which were being guarded by the police; 3) he posted videos he took of
the Capitol breach to Facebook; 4) he traversed almost the entire length of the U.S.
Capitol, exiting at the doors at the south end of the building; 5) his statements on
Facebook after January 6 revealed a lack of remorse; 6) he actively spread false
information on social media by downplaying the violence on January 6; 7) he lied to
FBI agents about what he saw and heard during his participation in the riot; and 8)
he stole a United States flag from the Capitol building which the FBI recovered
from his home." Government's Sentencing Memorandum, *United States v. Wiedrich*,
21-cr-581 (TFH) ECF 28 at 2-3.

but he did not act violently towards the officer and he left the Capitol when first

asked after 12 minutes.  He interacted peacefully with the police at the Capitol and

holds them in extremely high regard. *Compare United States v. Gruppo*¸21-cr-391

(BAH) (rejecting Government's request for incarceration based on the Defendant's

refusal to leave the Capitol despite repeated commands by police). And while there

is no indication that Mr. Rukstales provided any assistance, much less the

significant assistance that Mr. Schornak did to the FBI and the Select Committee.

In *United States v. Jordan Stotts*, 21-CR-272 (TJK), the court sentenced the

defendant to 24 months' probation with 2 months' home detention.  Mr. Stotts

shouted at police, scaled the wall to gain access to the Capitol, and made a few post

January 6, 2021 statements on social media.

Mr. Schornak did not go to the Capitol to interfere with the certification

process, he did not enter any sensitive areas and he did not assault anyone.  Yet,

the Government relies on cases involving all of those aggravating factors that are

not present here.  And unlike in cases relied upon by the Government, Mr.

Schornak expressed remorse consistently and repeatedly as best evidenced by his

cooperation.

For example, *United States v. Coutright*, 21:cr-72 (CRC), the Defendant was

sentenced to one month of incarceration.  But she went into a restricted area - the

Senate floor where the certification was to take place.  *United States v. Coutright*,

21:cr-72 (CRC), Government's Memorandum, ECF 26 at 17.  That defendant also

spent twice as much time in the Capitol and attempted to steal a sign but was thwarted by an officer.

In *United States v. Ridge,* 21-cr-406 (JEB), the Defendant planned to go to the Capitol and texted a friend: "I think we are going to try to block the session of congress." *United States v. Ridge,* 21-cr-406 (JEB), Government's Memorandum, ECF 32 at 2. He appeared to have encouraged the mob and remained inside for more than thirty minutes.  He was sentenced to 14 days of incarceration.

In *United States v. Tryon,* 21-cr-420 (RBW), the Defendant was among the first to breach the East side of the Capitol, despite being sprayed and struck with a baton.  He acknowledged that he was there "with the intent of making Congressional representatives listen to him." *United States v. Tryon,* 21-cr-420 (RBW), Government's Memorandum ECF 23 at 6.  He left only when forced to by law enforcement.  He expressed no remorse when speaking to law enforcement and instead stated, "the whole thing was powerful….It was awesome." *Id.*  He was sentenced to thirty days of incarceration.

*United States v. Jancart*, 21-cr-148 (JEB) involved individuals who were among the first to breach the Capitol.  They challenged the officers, screaming "We have you surrounded!" at them and took a bicycle rack to scale a wall.  They spent nearly 40 minutes inside the Capitol and one entered the Speaker's Conference Room while his codefendant photographed him.  As the Government mentioned, they also brought a gas mask, two way radios, Kevlar gloves and a medical kit and appeared to be aiding other insurrectionists on January 6th by posting on social

media that there was "little sniper coverage" on the roofs of the surrounding buildings. *United States v. Jancart*, 21-cr-148 (JEB), Government's Sentencing Memorandum, ECF 62 at 32-33.

*United States v. Reeder*, 1:21-CR-166 (TFH), does not help the Government. There, the Court imposed a sentence of 3 months' incarceration. But in that case, after the plea and before the sentencing, the prosecutor discovered evidence that the Defendant assaulted a police officer. As a result, the Government modified its allocution from two months to six months. *United States v. Reeder*, 1:21-CR-166 (TFH). Government's Sentencing Memorandum, ECF 26 at 1; Notice by USA, ECF 33 at 1. With the new evidence and adjusted allocution, the Court sentenced the Defendant to three months of incarceration.

To summarize, these defendants all engaged in an aggravating act that does not apply here. Mr. Schornak was not in the District to stop the certification, he did not assault anyone, he did not encourage violence or property destruction, he was not part of the initial breach, he stayed in the building for minimal time, he engaged with the officers in a friendly manner, he did not destroy evidence and he did not go to a particularly sensitive area when he was inside a building. He took a flag and made some regrettable posts following January 6th. However, he was cooperative with law enforcement on that day and has since done everything that he can to assist both the Select Committee and law enforcement since. He is sincerely remorseful. And incarceration is not necessary to adequately punish him.

## **CONCLUSION**

For the reasons stated above, Mr. Schornak respectfully requests that the

Court impose 24 months' probation and complete 100 hours of community service.

Mr. Schornak also requests that a fine not be imposed in light of his obligation to

pay $500 restitution.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Eugene Ohm
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Eugene_ohm@fd.org